The case today is 2015-1038 WBIP v. Kohler. Mr. Rosencrantz, please proceed. Good morning, Your Honors. Thank you. May it please the Court. Your Honors, the motivation to combine the known elements in this case was stark. Government agencies actively exhorted manufacturers to take land-based catalytic converter technology and put it on boats. A government-sponsored study said, do it this way. It provided a roadmap. The only two manufacturers in this industry followed the roadmap at exactly the same time to produce similar products using the very elements that were described in that government-sponsored study. The invention was obvious, and I'll turn later on if I have the time, to what makes this case even worse, which is that Kohler was found to have been willful even though it came out with its product four years before the patent even issued. So let me start with obviousness, which I'll spend most of my time on. To overcome six rejections, WBIP emphasized that what it invented was a compound control engine that performed two functions at the same time. But WBIP admits that another patent, the Phipps patent, had the same compound control structure, and all that it did was to add the coolant. Can we discuss the Phipps patent invention? Yes, Your Honor. Is it right that Phipps did something that's unconventional in having some kind of reverse control system with respect to air and fuel being introduced into the engine, where instead of the operator with a throttle introducing air into the engine, the operator is now the one responsible for injecting fuel into the engine, and then there's some kind of computer that then tries to figure out how much air then to introduce, which is the reverse of what is customarily done? Correct, and that was an element of novelty. But let's just be clear on what Phipps did and what Phipps didn't do and what was borrowed by WBIP. Has that kind of reverse system ever been reduced to practice as far as you know? There's no evidence in this record that that particular manifestation of the function has been reduced to practice. But I just want to emphasize, so if you look on page 25 of our opening brief, there is the claim, sort of the key claim here, the core of it, and it enumerates various elements. It's got five elements that were directly out of Phipps. Everyone agrees that Phipps taught those five elements. Right, but what I'm trying to understand is why would one of ordinary skill in the art pick up Phipps off the shelf if there's something kind of, I don't know, oddball about what Phipps is doing? And that's why I'm trying to understand what is EGR? What is this exhaust gas recirculation feature? Is that something Phipps needs in order to do its reverse of the air and the fuel? No, Your Honor. So Phipps has these five elements that we were talking about. Phipps also does two additional things. One is that it flips the fuel and the air, and that you see in a comparison between figure one and figure two of Phipps. That would be kind of odd in a marine generator, wouldn't it? Because instead of the air, you've got water. How does that work? No, so Your Honor, the water comes later on. The water comes to cool the exhaust. So the air, at least as described, for example, in the WBIP patents, the air and the fuel are combined in the combustion engine. The catalytic converter is a separate aspect, and it's cooled by water through a manifold or through a jacket. But the water doesn't mix with the marine engine. And that had been done many, many times. The addition of coolant to a marine engine doesn't interfere in any way. But to get back to Judge Chen's question, so there were two separate things. Take Phipps and those five elements, which were adopted by WBIP. Now, the seventh thing, that is, that one function that WBIP claims was inventive, is how you control the air and the gas. Do you do it forwards? Do you do it backwards? That's not necessary for an engine to operate. WBIP claims every single way of performing that function. It claims the forward way. It claims the backwards way. It claims the sideways way. But it still takes those five elements from Phipps. What it doesn't do is that reverse scheme. Why would you start with Phipps to answer the question you started with, Your Honor? Phipps is a catalyst converter engine that is applied to exactly the same problem that Westerbeek was trying to solve, which is a fixed speed engine. And the government says, take catalytic converter technology, use this feedback control scheme, which is straight out of Phipps as well, but it was common. And Phipps solves the fixed speed problem. So you can take the five elements. I guess my concern is, you know, I understand that Phipps has almost all of the elements of the claim. And so that's why your side chose Phipps to spotlight as the primary reference. But what comes with Phipps is some challenging issues for you in that we have unrebutted testimony from the other side saying that Phipps is a very strange breed of combustion engines, in that nobody has ever done this before, and nobody would want to even try to work with Phipps because of all these difficulties, whether it's doing the reverse of the flipping of the air in the fuel or whether it's even considering this recirculating the exhaust gas, which is going to be a wet exhaust system for a marine environment. Well, two things to say about that. Let me start where you ended, Your Honor. That exhaust gas recirculation, that was done in marine engines. In fact, the Southwest Research Institute report, the government-funded report that I mentioned, refers to EGR. So that was actually very common. And you just recirculate the gas up here where there's gas. You introduce the water later on downstream in the exhaust. Let me bring you back to some basics here, all right? We're reviewing a jury verdict of non-obviousness, right? Yes, Your Honor. And it was a black box verdict. You didn't ask for any specific findings. It was is it invalid or not, and the jury said not invalid, right? Yes, Your Honor. So under our case law, we have to assume that every underlying factual finding was found in favor of that conclusion, correct? Yes, Your Honor. And motivation to combine as well as likelihood of success as a component of motivation to combine are factual determinations, correct? Yes, with one caveat, Your Honor, and that is that this court doesn't just take testimony from experts on either side on motivation to combine and say, okay, that's a jury question. This court routinely looks behind the ultimate conclusion on motivation to combine and says, okay, two experts, as it did, for example, in ABT just two months ago. Two experts have announced an ultimate conclusion, but the basic facts were all agreed upon. No, but the standard of review that we're looking at is the review of a jury factual finding. In other words, we have to conclude that no reasonable jury could disagree with you on what FIPS teaches or whether there would be a motivation to combine FIPS given the very points that Judge Chen just made, correct? Yes, Your Honor. It's a substantial evidence with a couple of plain legal principles that this court consistently reviews for. For example, back to Judge Chen's earlier question, this court has said multiple times back to Beckman and again most recently in ABT that an expert can't just come in and say, oh, that patent, that would never work. It wouldn't even have worked in a land engine, which is all that this expert said. All he said was he was impeaching the original invention, not whether you can combine it with water. He was just saying I would never think that you could use a land engine in this way. So this court has said that's simply impermissible testimony simply to impeach what is presumed to be enabled prior art. But what if the expert testimony, we read it to say, FIPS is so bizarre. I don't see why one of ordinary skill in the art that was looking to solve the problem of reducing carbon monoxide emissions with a marine engine would start with this. Well, again, Your Honor, what this court does is to say that's an argument about inoperability. You take the patent for what it teaches. It's a little different than inoperability, or at least that's what I'm trying to express. I'm trying to express that there's something unusual and difficult and unattractive about FIPS in this expert's estimation that you wouldn't want to start with that. It's almost like starting from a trench rather than on plain ground in trying to solve the problem. Well, again, you still take FIPS for what it teaches, apart from that reversal of fuel and air. And it still teaches those five elements, including the one that was found to be inventive and that ultimately overcame the rejections, that one element being controlling speed and the air-fuel ratio at the same time. FIPS still teaches that, even though its implementation of that is described in a way that this inventor, excuse me, that this expert, their own engineer, referred to as oddball. But I also want to get back to Your Honor's point, Judge Chen, about this being unrebutted testimony. It was unrebutted only in the sense that Amber was the last one to testify. But our expert did get up on the stand and say, yes, of course there would be motivation to combine. He said those words, contrary to what my friend says on the other side. And he specifically said the reason you would start with it is because it solves that problem. This is exactly the sort of thing one would start with. And, again, to underscore, the government says start with catalytic converter technology, focus on that art. And this was the piece of prior art that... that you could have put together with these coolant elements and you wouldn't have gotten a functional generator. There were very few catalytic converters, Your Honor, that solved the fixed speed problem. I mean, this really was a finite universe of prior art on any engine at all that solved this fixed speed problem. And, again, the expert never said the reason I wouldn't do this is because water would get in the way with the way FIPS does it. What he says is FIPS is wrong. It's just plain wrong. It would never work on a land engine, much less to reduce carbon monoxide. And I also I do want to get to secondary considerations as well. You're eating into your rebuttal time if you do. I understood, Your Honor. And so let me just say that the secondary considerations fail on the single ground of lack of nexus. There is no nexus to what was claimed to be inventive about this. Actually, I should say what was inventive over the prior art. All that was inventive over the prior art was the addition of water. And I do also want to underscore on willfulness that whatever standard the Supreme Court ends up adopting, it will almost certainly have a knowledge element. And there was no evidence of any knowledge on the part of Kohler that these patents even existed when it infringed. Thank you, Your Honors. Mr. Simon. May it please the Court, David Simons on behalf of WBIP. I want to start with Mr. Rosencrantz's suggestion that FIPS was addressed to or solving the same problem. That's simply not the case. FIPS was an industrial land generator that was using something called exhaust gas recirculation. And that's an emission strategy where you take some of the exhaust and stick it back into the engine and burn it again. Why? Why do you do that? It burns exhaust more completely. It might reduce some small elements. It's one of the different emission strategies that's sometimes used. And the problem that FIPS was trying to solve was how to better control this exhaust gas recirculation. So he came up with the idea of this reverse control scheme where instead of when you push down on an accelerator, putting air into the engine and having the computer calculate the fuel, the reverse. When you push down on an accelerator, fuel goes in and then the computer calculates the air. And the idea being if you reverse it and you control the air input to the engine, you can better jive with this exhaust gas recirculation where you're also putting in some air. So that's the problem FIPS was dealing with. He was not dealing with the marine carbon monoxide poisoning problem at all. Completely different type of problem. It wasn't even marine. And there was no suggestion that you could use FIPS for marine. And there was extensive evidence at trial from Mr. Amber that you would not have considered adapting FIPS for a marine engine. He talked about it, Judge Chen was already asking about, that FIPS probably wouldn't even work for an intended purpose. But that's especially true for marine. And that's something we point out at page 24 of our brief, Mr. Amber's testimony at A15197, where he talks about how in the marine environment you need to have this, you have these compact engines and you need to have this very tight control. And FIPS's scheme, one of the skill in the art would look at it and immediately know it's not suitable for that type of engine. And why is that though? Well, because the FIPS scheme would not adequately control the engine. He said it just wouldn't work to even run an engine, let alone give you the kind of tight control if you're trying to do secondary emissions control, which was the problem that the inventor was dealing with here, which is the carbon monoxide particularly, but emissions generally. And in FIPS, with this reverse scheme that's designed to improve the exhaust gas recirculation, you won't get the kind of tight control you'd need for any kind of emissions control, other than the exhaust gas recirculation. There's nothing precluding using the exhaust gas recirculation feature in a marine environment. It's conceivable marine, they point in their reply. Southwest research seems to indicate that that's a possibility. Yes, it is a possibility in Southwest Research Institute. That was a prior art prototype that was being tested on a lab bench, but it's also noted in that same report that a lot more testing needs to be done in the water environment, in the actual real world environment. That was a lab prototype test. The problem here was a deficiency in what their expert said. He completely ignored what you would have to do to FIPS to make it actually conceivably work in a marine environment. He just said, all right, if you were to start with FIPS and someone were to tell you, I want this to be marinized, you would know to add a water jacket around the manifold and to inject some liquid coolant into the exhaustion. You'd know to do those two conventional features. But that is not enough. And the InTouch case that we cite in our brief talks about that. An expert can't simply say, if someone had told me to make this conversion, I could have done it. I would have known what to do. That's very different from a motivation to actually take FIPS and convert it to marine. But I guess the idea was there was a strong motivation at this particular time, given that the government was saying, we need to reduce carbon monoxide emissions from these marine engines. And so, therefore, the obvious thing to do is take existing land engine technology and see what we can do to marinize it, right? Well, the land engines had not solved the carbon monoxide problem either. This was talked about extensively at trial. Cars hadn't solved it at this point either. So one of skill in the art wouldn't think, okay, there's a solution out there for this carbon monoxide problem. I just have to go look at cars or land generators and import things. That wasn't the case at all. Mr. Amber talked about that in rebuttal. But using a catalyst would be a conventional thing to do. Well, if you'd ask someone in 2002, someone of skill in the field, if you put a catalyst into one of these marine engines, would you reduce carbon monoxide? His answer or her answer would be, yeah, but not by the meaningful amount you need to have any impact on safety. And I think an analogy probably will explain this point more clearly. If you were to climb to the top of the Empire State Building and jump off, you're going to have a sticky ending. If you were to climb to the 50th floor of the Empire State Building and jump off, half as bad a fall, half as far, same result. Same for the 20th floor, 10th floor, 3rd floor. To make that jump safe, you have to reduce the jump by more than 99%. The same was true for the carbon monoxide problem. The carbon monoxide output from the prior generators was tens of thousands of parts per million. But 1,200 parts per million is immediately dangerous to life. 800 immediately makes you nauseous. So if you were to ask someone of skill in the art, hey, if I put a catalyst in there, am I going to solve this problem? You're going to go from the 100th floor to the 50th floor maybe, but that's not any kind of solution. What this invention did was by putting together these different components. Do you have any testimony to this really vivid account that you're making? Oh, the Empire State Building? No. No, our expert didn't use the Empire State Building. He talked about Fenway Park at one point, that you're reducing from the entire stadium to the players and coaches and whatnot on the field. So a similar idea. And there was extensive testimony from Mr. Amber on the facts, setting aside the analogy. Could I ask you to turn to willfulness, please? Sure. Oh, well, good. I'd like you to address the knowledge requirement for willfulness, precisely what was the record evidence of knowledge. Okay, well, there are two things to point out here. First, there was actually a judicial admission of knowledge. Even if that's right, it only gets you to 2010, right? Right. But that no longer matters because they're not appealing the amount of enhancement. So how long they knew about the patent would only matter for the amount of enhancement of damages, not the existence of willfulness. Oh, are you saying – okay, but that's interesting. So are you saying they only appealed willfulness as a binary yes or no sort of issue on appeal, or did they appeal the time period over which they could be held willful? No, they only appealed that willfulness finding was not supported. They only appealed it really on the objective standard of Seagate and its knowledge point. But they didn't appeal that the judge's enhancement of damages was wrong because you looked at too long of a period of time. And you said there were two things to support the knowledge component. What was the other thing? The other thing was evidence at trial from which the jury could have reasonably inferred knowledge, going back to the issuance of the patent, and that was that we marked the product prominently with the patent number. This was a two-player market. The parties went to the same couple of trade shows every year. The idea that they never noticed that their only competitor's product had this very big patent number marking on it for all these years is hard to believe. And they presented nothing at trial that would counter that inference. They didn't call a single witness who worked at Kohler after 2008 when the patent issued. So the judge actually found in his decision that there was evidence from which a jury could infer knowledge going back before 2010, the point where they admitted knowledge. So just accepting the standard of review here on this knowledge point, there's plenty of evidence in the record to conclude knowledge all the way back to when the patent issued. But it's judicially admitted for 2010 on, which is all that would matter for this appeal issue. Okay. So on the objective component, we are operating under Seagate and Bard at this moment. So given that, there certainly were a lot of arguments that were made. Ultimately, the jury did not agree on obviousness, and the court supported that conclusion on JAMAL. But how do you get to the point of saying that it was completely unreasonable? Well, I think the district court was right to say it was unreasonable because it's classic hindsight reconstruction. It's we're in litigation, here's this FIPS reference that happens to disclose one of the limitations of the claim in a bizarre reverse embodiment designed for land use and designed to solve a different problem. And it's pure hindsight to go from that all the way to the invention. And the secondary considerations here were so powerful. Now, Mr. Rosenkranz briefly mentioned the nexus point. And I think on nexus, they are simply using the wrong legal standard. The way they're approaching nexus is to start with a missing claim limitation in the prior art. And so you have to show nexus to that missing limitation. But what the case law says is you start with the objective evidence, the praise, the commercial success, and you have to show a nexus between that body of praise and commercial success and some novel combination of the claims. Merits of the claimed invention. Merits of the claimed invention is the most common phrase. Other phrases are used, but that's the idea. And the problem with Kohler's approach is if you base it off of whatever prior art reference the defendant happens to put forward, they could put forward two different prior art references, and now you're proving next I instead of nexus. So you don't want to return to the gist or heart of the invention notion from the Pre-52 Patent Act? No, no, it's not a gist issue. What was the secondary considerations? What was the objective evidence? What was the praise to? And is that praise linked to the combination of the claims? Something about those claims that's a novel combination. Is there a case that you know of where we identified the merits of the claimed invention as some combination of elements? Typically, we're zeroing in on one particular feature in a claimed invention and saying, okay, this is the contribution of the inventor. Now we're going to look and see whether the secondary evidence lines up with this particular feature being the driving force. Well, that's a shortcut that's used when the invention is a particular new limitation as opposed to a novel combination of old elements. And I can point to three cases. Transocean, 699 F3rd 1340. The secondary considerations were to the efficiency that was achieved by the claimed combination, not to a particular one limitation that was different from a particular reference. Spectralytics, 649 1336 F3rd 1336, which was a patent that had to do with machinery for carving stents, carving patterns into stents. The secondary considerations were success of the stents and the ability that the stents had novel, or the stents had intricate patterns that you couldn't carve with the machines of prior art. So again, you're looking at the stents that were created by the machine. And then the third one, which I think is the best one, is Rambus, which is 731 F3rd 1248. And I'll read a passage from it. While objective evidence of non-obviousness lacks nexus, if it exclusively relates to a feature that was known in the prior art, the obviousness inquiry centers on whether the claimed invention as a whole would have been obvious. Rambus's objective evidence of non-obviousness was not limited to the dual-edge functionality in Engaki, that's the prior art, that transferred a single bit each half cycle. At least some of Rambus's objective evidence pertained to Rambus's overall memory architecture. And so those three cases I think are good examples. But there's just a logical flaw with approaching it the way Kohler does, because you could present two different prior art references where there's one limitation missing in reference A, a different limitation missing in reference B, and then you're suddenly... So what are you relying on, the entire claim? It's a novel combination. This is a combination claim, we don't dispute that, that every limitation of the claim is shown in some other piece of prior art somewhere. Mr. Rosenkranz points out that during the original prosecution, your claims kept getting rejected over and over again, until you finally amended the claim to add this feature about maintaining engine speed while also at the same time monitoring the air-fuel ratio. Yeah, that controller that does those two functions distinguished a number of propulsion references, like Fujimoto, which is the reference that was talked about a lot at trial but not here. So why shouldn't we focus on that element? See, now he's telling you to focus on the water element as the nexus. And that's showing exactly the problem. What distinguished Fujimoto was the controller doing those two things simultaneously. What distinguishes FIPS is a number of elements, the water-cooled catalyst, the injection of water into the exhaust. So if you're getting away from the merits of the claimed invention and into a limitation-by-limitation analysis and nexus, then a lot of this case law falls apart. It's the whole point of secondary consideration. Before you sit down, do you want to mention your cross-appeal quickly? Yeah, I believe it's brief, thoroughly. If you have any questions specifically about it. But I think the problem with the reason we have the cross-appeal is the district court just didn't apply the proper standard in assessing injunction. It needs to reapply that. Is it just simply a question of using the magic words to say, I consider this element, this element, this element? Couldn't one factor be so powerful that it supports the district court's conclusion? Absolutely, and Acumet is an example of that. But he didn't make that finding here. He didn't say, I considered and weighed all the factors and this one overwhelms. All he said is, I find public interest favors Kohler and the other factors need not be addressed. And that's different from making a finding that he actually balanced them. And his public interest finding was founded upon a factual error that he actually conceded in the reading. I'm trying to understand exactly what he's conceding. So the factual error was the assumption that your client would not have the capacity to satisfy the market, is that right? That's right. And on reconsideration, is he conceding that your client would have the capacity to satisfy the market or just more capacity than he thought? More capacity than he thought. But it leaves an open question at the very least, you know, that the whole public interest finding was based on this capacity point, this false capacity point that Kohler put in their brief. And I think the judge needs to reassess this. There really isn't great harm in a re-and here because there's no injunction in place right now. So it's not... Receiving a compulsory royalty then? Yes, yes. Do you read the eBay Supreme Court opinion as requiring a patent owner to prove each of one of those four factors as favoring the patent owner in order to be granted injunction? No, I don't read eBay that way and this court has not. Robert Gash is a good example of that. And it's possible that's what the district court had. He was reading it, which is incorrect reading under this court's precedent. Okay, thank you, Mr. Simon. Mr. Rosenkranz, a little bit of rebuttal time left. Thank you, Your Honor. Let me start with Phipps. Phipps itself says that the problem it is solving is not just what Mr. Simon says but was an engine control system governing speed and emission control. And the background says it as well. Stable speed control plus emission control. There is further no evidence in the record that Phipps did not control carbon monoxide emissions. It says it did. There's no evidence that it didn't. There's just an expert who was the engineer for Westerbeek saying, well, I never would have started with it. But the question under KSR is not would you have started with it. The question under KSR is, is it within the panoply of prior art that one would consider? And it was. Well, it's not just is it in the panoply of prior art. Is it in the panoply of prior art? Is it something that there would have been a motivation to take that prior art with a likelihood of success in creating the combination? And there's evidence that, in fact, there was not a likelihood of success. There is evidence only with respect to that particular piece of it, only I wouldn't have used this because I don't think it would have worked. Not I wouldn't have used this because I don't think it would have worked with water. They were impeaching the prior art reference itself, which is exactly what you can't do. And the references to water were all references to, boy, you can't just take a land engine and throw it in water. It was, you know, it's got to be fire tested and water needs to stay away from the engine. Those were all problems that had been solved. And with respect to a motivation, again, the SRRI report says this is how you would do it. And then there was evidence before 2003 that when people tried what the SRRI report recommended, they did indeed achieve negligible CO. And that's at page 17, 2010 to 11. One last word on knowledge, if I may. You cannot affirm a jury verdict without evidence of knowledge. There was no evidence of knowledge before the jury. WBIP did not introduce this admission before the jury about this finding out in 2010. And this court is reviewing the jury verdict. And there's no evidence that this product with the patent on it was ever shown in a show after 2008, which was when the patent was issued. There was evidence that it was shown in a show on a trial basis way back in 2003, 2004, actually. And so there's just simply no evidence, and certainly not on a clear and convincing basis, to demonstrate that this subjective element was satisfied. If there are no further questions, we respectfully request that the judgment be reversed. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning. It's an o'clock a.m.